2023 IL App (1st) 220640

FIFTH DIVISION
November 17, 2023

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

No. 1-22-0640

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 15760 |
| | ) | |
| WILLIE STREATER, | ) | Honorable |
| | ) | Ursula Walowski, |
| Defendant-Appellant. | ) | Judge Presiding. |
| | ) | |

JUSTICE MIKVA delivered the judgment of the court, with opinion.
Presiding Justice Mitchell and Justice Lyle concurred in the judgment and opinion.

**OPINION**

¶ 1    After a jury trial, defendant Willie Streater was convicted of aggravated kidnapping and aggravated criminal sexual assault and sentenced to 35 years in prison. On appeal, he argues (1) the State failed to prove him guilty of the aggravated form of criminal sexual assault based on his displaying a dangerous weapon because the weapon—a metal baseball bat—was not displayed during the commission of the sexual assault; (2) the trial court erred in denying his motion to quash arrest and suppress evidence because the arrest was an illegal, warrantless arrest based on an investigative alert; and (3) he was denied a fair sentencing hearing based on the trial court's

comments at sentencing that showed he was being punished for holding the State to its burden of proof and exercising his constitutional right to trial. For the following reasons, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3      Mr. Streater was charged with aggravated kidnapping, aggravated criminal sexual assault, and aggravated stalking on September 12, 2017. The victim was K.W., who was 17 years old at that time.

¶ 4                              A. Pretrial Proceedings

¶ 5      Before trial, the State filed a motion to allow evidence of other crimes, seeking to introduce testimony from four women whom Mr. Streater had been convicted of stalking when they were teenagers. The State maintained this evidence would show Mr. Streater's identity; intent; motive; absence of mistake; common design, scheme, or plan; lack of consent; and *modus operandi*. The court granted the motion as to three of the four prior crimes, and the State only introduced testimony from two of those women at trial.

¶ 6      At the pretrial hearing on Mr. Streater's motion to quash his arrest and suppress evidence, Officer Jack Reed testified that he was one of the officers present for Mr. Streater's arrest on October 7, 2017. Officer Reed testified that Mr. Streater was arrested in the parking lot of his apartment complex at approximately 1 p.m. Officer Reed acknowledged that at the time Mr. Streater was arrested, there was no arrest warrant for him. The officer explained that they arrested Mr. Streater based on what the detective working on the case, Detective Johnnie Minter-Edwards, had told him—that she was investigating an aggravated criminal sexual assault case and that the victim had identified Mr. Streater in a photo array. When asked if the arrest was also based on an investigative alert, Officer Reed said it was not.

¶ 7      The State argued that Mr. Streater had been arrested in a public place and that probable

cause supported the arrest. Defense counsel argued that the arrest was really based on an investigative alert. Defense counsel also argued that the police "could have easily gotten an arrest warrant through a magistrate, but they didn't" and that Officer Reed's reliance on the detective's word alone was a violation of the ban against unreasonable searches and seizures.

¶ 8    In denying the motion to quash, the trial court said, "[y]ou do not need an arrest warrant when probable cause exists and efforts are made by police officers based on probable cause and a Defendant is arrested in public, as this was the case in this case." The judge found there was probable cause based on the information the detective "personally gave to the officers, [and] the officers relied on that information properly." The court found no constitutional violation.

¶ 9                                    B. Trial

¶ 10                        1. Mr. Streater's Assault of K.W.

¶ 11    K.W., who was 22 years old at the time of trial, testified that in September 2017, she was a senior in high school. She took a bus to school at that time, using the bus stop at 97th Place and Vincennes Avenue, which was approximately a block away from her home. She was usually by herself at the stop and would catch the bus around 7:30 or 7:40 a.m.

¶ 12    According to K.W., at that time, Mr. Streater, whom she identified in open court, would drive by in an orange four-door Jeep and bother her "[a]lmost every day" while she was waiting for the bus. K.W. did not know him at the time. K.W. said Mr. Streater would offer her rides to school or ask if she wanted money as he drove past, but she never accepted either. She did not tell anyone she was being bothered by a man at the bus stop because she was not worried at the time.

¶ 13    K.W. said that on the morning of September 12, 2017, she was at the bus stop, alone, when Mr. Streater came up behind her on foot and grabbed her. She noticed him pull up in his vehicle, but she first saw him when he was on foot and grabbed her. K.W. testified that Mr. Streater had a

metal bat in his right hand and grabbed her right arm just above her elbow with his left hand. Mr. Streater told her to get in the car and pulled her two or three feet away to where it was parked. The car door was already open, and Mr. Streater pushed her into the front passenger seat. K.W. said she "was in shock, so [she] really didn't say anything." When K.W. was in the car, Mr. Streater got into the driver's seat, put the bat in the back seat, then drove off. Mr. Streater drove to an "alley where it said no parking." K.W. first said the alley was a couple blocks away, but on cross-examination agreed that it was approximately two miles away and agreed they were in the car for 10 or 15 minutes. K.W. testified that while they were driving, Mr. Streater "told [her] that [she] wasn't going anywhere and that [she] was the only one for him and that [her] vagina was his and his penis was [hers] and stuff like that." K.W. did not try to get out of the car while Mr. Streater drove. She said she noticed a closed pocketknife in the middle of the dashboard, but Mr. Streater did not touch it.

¶ 14    K.W. testified that once the car was stopped in the alley, Mr. Streater "threw [her] into the back seat," which hurt, then he got into the back seat on top of her. The bat was next to them on the back seat, but neither she nor Mr. Streater attempted to grab it. K.W. said Mr. Streater took off both of their clothes and kissed her, then penetrated her vagina with his penis. The contact went on for "probably like three to like five minutes," until a construction worker walked into the alley. At that point, Mr. Streater pushed K.W. out of the car and drove off.

¶ 15    K.W. said that she did not tell the construction worker that she had just been sexually assaulted because "[she] didn't feel comfortable." K.W. then walked to school and texted her mother from a classmate's phone. K.W. did not tell her mother that she had been sexually assaulted at that time, explaining: "my mom, she's very emotional, so I knew her reaction wasn't going to be well to what I was telling her." She did tell her mother other details about what had happened,

prompting her mother to arrange for her father to pick her up from school.

¶ 16    When K.W.'s father picked her up, she did not tell him about the assault "[b]ecause I know how my father is and I know he was going to like try to find him." She went straight home, but noticed blood in her underwear, which was unusual. K.W. then told her sister, Chanti W., that she had been sexually assaulted.

¶ 17    Chanti, K.W.'s older sister, testified that when K.W. approached her, Chanti could tell she was upset because she was quiet and did not "really want to tell [Chanti] what was going on." K.W. told Chanti about "the man that had pulled the bat out on her, that he raped her," and then K.W. showed Chanti the blood in her underwear. Chanti testified that she told their mother what happened, and their mother told their father.

¶ 18    K.W. went to the hospital where she told the doctors and nurses what had happened and was treated for a sexual assault. She also went to the police station to file a report.

¶ 19    After September 12, 2017, K.W. said she would wait at the same bus stop in the morning, but only with a family member. K.W. continued to see Mr. Streater in her neighborhood, "[d]riving past like taunting [her] and stuff." In explaining the taunting, K.W. said, "[i]t was one time he drove past and was waving, smiling, and my mom, she was standing at the bus stop with me so she seen him." K.W. did not attempt to get his license plate number.

¶ 20                              2. The Investigation

¶ 21    Rachel Foxx, a registered nurse, testified that at approximately 6:50 p.m. on September 12, 2017, she was working in the emergency room when K.W. was brought into a patient treatment room. K.W. told Ms. Foxx that a man had forced her into his car with a bat, driven a few blocks away, then, in Ms. Foxx's words, "forced her into the back seat and had intercourse with her vaginally." Ms. Foxx obtained K.W.'s consent to administer a criminal sexual assault kit and

identified the kit at trial.

¶ 22    Morris T., K.W.'s father, testified that after he found out that K.W. had been sexually assaulted, he also learned that the offender had been driving a four-door orange Jeep. Morris said that every day before work, he would stand at the bus stop looking for the Jeep to try and get a license plate number. One day, as he drove to work along the route the bus took to K.W.'s school, he saw the Jeep at a stoplight and followed it, getting its full license plate number. Morris wrote down the license plate number on a piece of paper and gave it to his wife, who gave it to the police.

¶ 23    Detective Minter-Edwards, who was retired from the Chicago Police Department after working as a detective for 15 years, testified that she was assigned to investigate K.W.'s criminal sexual assault case on September 16, 2017. She met with K.W. on September 21, 2017, and said K.W. did not know who assaulted her, though she described his vehicle. As part of the investigation, Detective Minter-Edwards asked K.W. to retrace the route her attacker took, and K.W. agreed to do so. The detective picked up K.W. from her home, and K.W. was able to lead the detective by sight to the alley that ran behind 10443 South Hale Avenue.

¶ 24    Detective Minter-Edwards testified that sometime in late September she spoke with Morris, and he gave her the license plate number he had written down. The detective ran the license plate number, and found it belonged to a 2002 four-door Jeep registered to Willie Streater. She also learned that Mr. Streater had previously lived at 10443 South Hale Avenue. K.W. identified Mr. Streater in a photo array on September 30, 2017, and he was arrested on October 7, 2017.

¶ 25    Elizabeth Zawicki, a forensic scientist and DNA testing expert with the Illinois State Police, testified that her lab received a sealed buccal swab standard from Mr. Streater and one from K.W., from which a DNA profile suitable for comparison for each individual was identified. The lab also received K.W.'s criminal sexual assault kit, and DNA analysis was conducted on the

vaginal swabs from the kit. In addition to K.W.'s DNA, one human male DNA profile was identified on those swabs. When compared to Mr. Streater's DNA profile, Mr. Streater was "included," and the expected frequency of that male DNA profile in the general population was calculated as "no more common than approximately one in 2.3 octillion [(27 zeroes)] unrelated individuals." On cross-examination, Ms. Zawicki acknowledged that the criminal sexual assault kit also included head hair combings, pubic hair combings, and fingernail scrapings, but as far as she knew, no one tested those other materials.

¶ 26                                   3. Other-Crimes Evidence

¶ 27     Before the two other-crimes witnesses were called, the trial court instructed the jurors that the evidence was being "received on the issue of identity, intent, motive, absence of mistake, common design, scheme or plan, lack of consent and modus operandi" and could only be considered by them "for that limited purpose."

¶ 28     Wendelyn Woods testified that in 1994 she was 16 years old and going to Hirsch High School for summer school, located at 7740 South Ingleside Avenue in Chicago, Illinois, about a 10-minute walk from her home. On July 20, 1994, as she was walking to school, she saw a "vehicle following slowly," though she did not remember what the vehicle looked like. She knew the vehicle was following her because it had followed her "like three prior times, but [she] kind of brushed it off until that day." Ms. Woods continued walking to school but said that the driver— whom she identified as Mr. Streater—stopped and exposed himself from within the car, with the car door open so she could see his thigh, leg, and penis. Mr. Streater did not show her a bat or a knife or try to pull her into his car. Ms. Woods did not get in the car, but instead walked to school and told her mother what happened. Ms. Woods saw Mr. Streater in the same car on July 22, 1994, as she was walking to school. She memorized his license plate number, wrote it down when she

7

arrived at school, then told her mother and the police.

¶ 29    Lisa Triplett testified that in September 1999 she was 15 or 16 years old (the date of birth she gave, however, indicates that she had, in fact, been 14 at that time) and attending high school. She took a bus to school from a stop located at 79th Street and Princeton Avenue, which was about 1½ blocks from her home. On September 23, 1999, Ms. Triplett took the bus as usual, but said that "a person pulled up in a van asking [her] if [she] wanted a ride," to which she said no. She saw him again in the same car, and he again pulled up and offered her a ride. Ms. Triplett again said no, got on the bus, and went to school, but told her mother what happened. A week or two later, the same man "pulled up to the stop where [she] was waiting to take the bus and [she] noticed him fondling himself," touching his penis. He again offered her a ride and she said no. The driver did not show her a bat or a knife and did not force her into his car. Ms. Triplett got his license plate number and went with her mother to file a police report. On October 14, 1999, she viewed a photo array and picked out Mr. Streater as the person who had been coming up to her at the bus stop. She also identified Mr. Streater from an in-person lineup.

¶ 30    The State rested, and the defense presented no evidence.

¶ 31                          C. Deliberations and Sentencing

¶ 32    The jury deliberated for approximately one hour before finding Mr. Streater guilty of aggravated kidnapping and aggravated criminal sexual assault.

¶ 33    The presentence investigative (PSI) report stated, in a section titled "Defendant's Version of the Offense," that Mr. Streater "did not comment on the details of the case because he plans to appeal," but said that:

> "[T]he prosecutor's main and only witness lied on the stand. He [(Mr. Streater)] expressed
> [that] the victim was an acquaintance and was afraid of her father.

Mr. Streater said he hopes the victim will one day admit that Mr. Streater did not do the crime which he is convicted so he will not be punished for something he did not do. He stated he can only pray that one day that will happen."

¶ 34   At the sentencing hearing, the defense presented as mitigation a certificate of a Bible study and ministry Mr. Streater had completed, as well as one for 12 units of study by correspondence that he had completed in jail. The defense also introduced family impact statements in the form of letters from four members of Mr. Streater's family.

¶ 35   The State argued in aggravation that Mr. Streater "brutally violated" K.W. in the back seat of his car and had "proven himself to be a danger to the community and to society with those acts alone." The State further argued that Mr. Streater had four convictions for similar behavior—taking or trying to take women or young girls off the street and into his car. The State argued that it was statutorily mandated for the sentences for aggravated kidnapping and aggravated criminal sexual assault to be consecutive and, in total, Mr. Streater was facing 22 to 70 years in prison. The State asked that Mr. Streater "not be sentenced to a minimum due to the nature of this offense in that he took an innocent girl off the street and raped her."

¶ 36   The defense argued that Mr. Streater was 59 years old and that prior to the present offense he had not been in contact with the police since 1999 and had only four Class 4 felony convictions on his record. Counsel argued that in the last 17 years prior to his arrest in this case, Mr. Streater "was a model citizen as far as I know it, Judge. He worked as an auto technician, raising his children. Unfortunately, due to his disability and extensive medical issues, it was very difficult for him to work in the past decade." But he continued to volunteer at the Salvation Army and would "provide free car service to people with limited financial means." Mr. Streater had kept busy while in jail, with Bible study and correspondence courses.

¶ 37    In allocution, Mr. Streater thanked the trial court "for [its] patience throughout this whole sensitive ordeal" and apologized to both the court for "any undue inconvenience" and to K.W.'s family "to have to go through any undue stress, pain and suffering." He said he was "sorry that this happened" and hoped and prayed that K.W.'s family could "find it in their heart to forgive [him]."

¶ 38    The trial court said it considered the factors in aggravation and mitigation. In mitigation, the court mentioned the letters from Mr. Streater's family, the Bible study and correspondence school, "as well as what [the court] read about [his] history in the presentence investigation." In aggravation, the court noted that Mr. Streater was "convicted of stalking twice previously." The court discussed the details of the crime committed against K.W., finding them "quite aggravating, especially looking at the other witnesses that testified" concerning Mr. Streater's prior convictions. The court then stated:

> "And usually, you know, Defendants have a right to say their version of the offense, which is fine, but in a sense, it is still quite a bit alarming that you're basically saying that you knew this victim and she lied on the stand and that this didn't happen to her and that you hope that one day she'll admit that this never happened to her. I just—I find that disturbing.
>
> Obviously, you have the right to claim your innocence, Mr. Streater. But to say things like that, I find is inappropriate. And she testified. She was able to be seen by the jurors, by everybody in the courtroom, and had to testify to what happened to her and the jury believed her. They found you guilty."

¶ 39    The court then sentenced Mr. Streater, "based on all the factors in aggravation and mitigation," to 25 years on the aggravated criminal sexual assault, and 10 years for the aggravated

kidnapping, to run consecutively, for a total of 35 years in prison.

¶ 40    The court denied Mr. Streater's motion to reconsider his sentence, and this appeal followed.

¶ 41                                II. JURISDICTION

¶ 42    On May 3, 2022, Mr. Streater was sentenced and his motion to reconsider his sentence was denied. He timely filed his notice of appeal that same day. We have jurisdiction over this appeal under article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 603 (eff. Feb 6, 2013) and Rule 606 (eff. July 1, 2017), governing appeals from final judgments in criminal cases.

¶ 43                                III. ANALYSIS

¶ 44    On appeal, Mr. Streater argues (1) the State failed to prove him guilty of *aggravated* criminal sexual assault based on his displaying a dangerous weapon because the weapon—a metal baseball bat—was not displayed during the commission of the sexual assault; (2) the trial court erred in denying his motion to quash his arrest and suppress evidence because the arrest was based on an investigative alert and was therefore an illegal warrantless arrest; and (3) he was denied a fair sentencing hearing where the trial court's comments at sentencing showed Mr. Streater was being punished for holding the State to its burden of proof and exercising his constitutional right to trial. We consider each issue in turn.

¶ 45                          A. Sufficiency of the Evidence

¶ 46    Mr. Streater first argues that his conviction for aggravated criminal sexual assault should be reduced to criminal sexual assault because the State did not prove beyond a reasonable doubt that he used the metal bat "during the commission of the sexual assault or that the display of the bat was contemporaneous with the sexual assault."

¶ 47    Mr. Streater was convicted of aggravated criminal sexual assault pursuant to section

11

11-1.30(a)(1) of the Criminal Code of 2012 (720 ILCS 5/11-1.30(a)(1) (West 2016). That statute provides:

"(a) A person commits aggravated criminal sexual assault if that person commits criminal sexual assault and any of the following aggravating circumstances exist during the commission of the offense ***:

(1) the person displays, threatens to use, or uses a dangerous weapon, other than a firearm, or any other object fashioned or used in a manner that leads the victim, under the circumstances, reasonably to believe that the object is a dangerous weapon[.]" *Id.*

¶ 48  Mr. Streater's argument requires us to interpret the phrase "during the commission of" in this statute. See *People v. Smith*, 2019 IL App (1st) 161246, ¶ 24. "Our task in interpreting a statute is to give effect to the legislature's intent, 'keeping in mind that the best and most reliable indicator of that intent is the statutory language itself, given its plain and ordinary meaning.' " *Id.* ¶ 25 (quoting *People v. Young*, 2011 IL 111886, ¶ 11). It is only if the plain language is ambiguous that we will turn to other tools of statutory construction. *Id.* We review questions of statutory interpretation *de novo*. *People v. Giraud*, 2012 IL 113116, ¶ 6.

¶ 49  According to Mr. Streater, K.W.'s testimony showed that he only displayed the bat while forcing her into the car, but that the bat "was temporally removed from the act of penetration" because "K.W. admitted that [Mr.] Streater never touched the bat once she entered the Jeep against her will." Mr. Streater argues that the bat was therefore not used during the commission of the sexual assault.

¶ 50  The defendant in *Smith* made the same argument, contending that the State failed to prove he used a knife during a sexual assault "because he was not holding or displaying the knife at the

precise moment the sexual penetrations occurred." *Smith*, 2019 IL App (1st) 161246, ¶ 24. In analyzing the claim, we pointed out that "criminal sexual assault occurs when a person 'commits an act of sexual penetration and *** uses force or threat of force.' " *Id.* ¶ 27 (quoting 720 ILCS 5/11-1.20 (West 2014)). We explained that, therefore, "the 'offense' of criminal sexual assault is not merely sexual penetration, full stop—it is sexual penetration plus the use or threat of force, a separate element of the offense." *Id.* ¶ 28. The *Smith* court noted that a threat of force may precede the sexual penetration by some amount of time; it then "lingers over the victim, who is subdued precisely because the victim has a reasonable belief that the accused 'has the ability to execute that threat.' " *Id.* ¶ 31. As the court further explained:

> "[T]he 'offense' of criminal sexual assault does not begin and end at the fixed point in time of the sexual penetration. It begins when the offender first uses force or the threat of force along the way toward ultimately accomplishing sexual penetration. So when the aggravated criminal sexual assault statute provides for the aggravation of the crime based on the 'display[ ], threat[ ] to use, or use[ ]' of a dangerous weapon 'during the commission of the offense,' the phrase 'during the commission of the offense' must include the period of time in which the offender used or threatened force. [Citation.] Any other reading would ignore one of the elements of criminal sexual assault and focus exclusively on the other, sexual penetration." *Id.* ¶ 32.

¶ 51  We find the reasoning in *Smith* compelling. Although the display of a dangerous weapon must occur *during the commission* of the offense of criminal sexual assault, it need not occur during sexual penetration; it may occur as part of the use or threat of force that is also a necessary element of this crime. With this framework in mind, we now consider whether the evidence here was sufficient to show that Mr. Streater displayed the metal bat during the commission of the

sexual assault.

¶ 52    "The State has the burden of proving beyond a reasonable doubt each element of an offense." *People v. Gray*, 2017 IL 120958, ¶ 35 (citing *Jackson v. Virginia*, 443 U.S. 307, 315-16 (1979), and *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224 (2009)). "When the sufficiency of the evidence supporting a criminal conviction is challenged, '[t]he relevant inquiry is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *People v. Ramos*, 2020 IL App (1st) 170929, ¶ 57 (quoting *People v. Ward*, 215 Ill. 2d 317, 322 (2005)). We will find the evidence was insufficient to support a conviction only if it was " 'so unreasonable, improbable or unsatisfactory that it raises a reasonable doubt of [the] defendant's guilt.' " *Id.*

¶ 53    In this case, the evidence was undisputed that Mr. Streater used the bat to compel K.W. to get into his car before driving her to the alley where the sexual penetration occurred. A rational trier of fact could reasonably find that Mr. Streater's commission of criminal sexual assault began when he used the bat to compel K.W. to get into his car before driving her to the alley where the sexual penetration occurred. The act of forcing K.W. into his car was a necessary step toward Mr. Streater ultimately accomplishing the act of sexual penetration.

¶ 54    In addition, under the facts of this case, the presence of the bat in the back seat while K.W. was being sexually penetrated could also support a finding that a dangerous weapon was displayed during the commission of the criminal sexual assault. To be clear, the presence of the bat, alone, would not necessarily be enough to aggravate the criminal sexual assault. However, as the State points out, the bat "had just been brandished in a threatening manner" to get K.W. into the car. In this circumstance, a rational trier of fact could also find that the presence of the bat in the back seat a short time after the bat was used to force her into the car further constituted a display of a

dangerous weapon during the commission of the criminal sexual assault.

¶ 55    There is nothing inconsistent between our holding and *Giraud*, 2012 IL 113116, a case that Mr. Streater relies on. The question there was "whether a defendant's knowingly exposing the victim of a sexual assault to HIV *** constitute[d] a threat or endangerment of her life during the commission of the offense." *Id.* ¶ 6. Threatening or endangering the life of the victim or another person is another factor that can aggravate a criminal sexual assault. See 720 ILCS 5/12-14(a)(3) (West 2006) (the relevant statute in *Giraud*). The *Giraud* court concluded that there was no aggravating factor because, "as a matter of law, mere exposure of the victim to HIV during the commission of the offense did not threaten or endanger her life." *Giraud*, 2012 IL 113116, ¶ 39. That case does not in any way undercut our conclusion that use of the bat to get K.W. into the car was use of the bat during the commission of the offense.

¶ 56                              B. Investigative Alert

¶ 57    Mr. Streater next argues that his motion to quash his arrest and suppress evidence should have been granted because it was based on an unsworn "investigative alert." Mr. Streater argues that the DNA evidence obtained as a result of the arrest should have thus been suppressed and asks us to reverse his convictions and remand "for a new trial without the tainted evidence." Mr. Streater does not challenge the trial court's finding that probable cause existed for his arrest.

¶ 58    The procedures surrounding investigative alerts are set out in Chicago Police Department Special Order S04-16. Chi. Police Dep't Special Order S04-16 (eff. Dec. 18, 2018), https://directives.chicagopolice.org/#directive/public/6332 [https://perma.cc/BLR2-EJE6]. An investigative alert is defined as a notice "identifying a specific individual that Bureau of Detective [(BOD)] or Bureau of Organized Crime [(BOC)] investigative personnel are attempting to locate." *Id.* § II(A). Investigative alerts fall into two categories: "Investigative Alert/Probable Cause to

Arrest" and "Investigative Alert/No Probable Cause to Arrest." *Id.* "An Investigative Alert/Probable Cause to Arrest identifies an individual [who] is wanted by [BOD] or [BOC] investigative personnel concerning a specific crime, and while an arrest warrant has not been issued," according to the police "there is probable cause for an arrest." *Id.* § II(A)(1). Officers who run a check on an individual with an "Investigative Alert/Probable Cause to Arrest" on file are to arrest the subject if they are not already in custody. *Id.* § V(A)(1)

¶ 59    The State argues that, in this case, Mr. Streater has failed to prove that an investigative alert had been issued in this case. The State is correct that Officer Reed, the arresting officer, testified at the motion to suppress hearing that he was not aware of an investigative alert at the time he arrested Mr. Streater. Rather, Officer Reed explained, Detective Minter-Edwards told him that K.W. had identified Mr. Streater in a photo array, and he should be arrested.

¶ 60    We agree with Mr. Streater, however, that it makes no difference whether Mr. Streater was arrested directly because of an investigative alert or because the arresting officer was told to arrest him by the investigating detective. The question posed by Mr. Streater's argument remains the same—was it a violation of the Illinois Constitution to arrest Mr. Streater without a warrant based solely on an investigation done by other officers, absent some time constraint or other exigent circumstances? Where, as here, there was probable cause for the arrest and it was in a public place, our answer to this question is no. For the reasons we discuss below, we reject Mr. Streater's argument and decline to follow those cases that have found that an arrest based on an investigative alert violates the Illinois Constitution.

¶ 61    Both the fourth amendment of the United States Constitution and article 1, section 6, of the Illinois Constitution prohibit unreasonable searches and seizures. See U.S. Const., amend. IV; Ill. Const. 1970, art. 1, § 6. It is well-established that the fourth amendment permits a public

warrantless arrest based on probable cause. *United States v. Watson*, 423 U.S. 411, 416-17 (1976). And in Illinois, our supreme court has said that "[w]hen officers are working in concert, probable cause can be established from all the information collectively received by the officers even if that information is not specifically known to the officer who makes the arrest." (Internal quotation marks omitted.) *People v. Buss*, 187 Ill. 2d 144, 204 (1999).

¶ 62    Mr. Streater argues that his public warrantless arrest violated the Illinois Constitution, relying on *People v. Bass*, 2019 IL App (1st) 160640, *aff'd in part and vacated in part*, 2021 IL 125434, and *People v. Smith*, 2022 IL App (1st) 190691. In *Bass*, the majority observed that "Illinois follows a 'limited lockstep' approach" in interpreting the Illinois Constitution in light of the United States Constitution, "which assumes the primacy of federal constitutional interpretation but looks to the Illinois Constitution for any gap-filling potential it may have." *Bass*, 2019 IL App (1st) 160640, ¶ 40. The *Bass* majority also concluded that "[a] critical difference exists between the fourth amendment to the United States Constitution (U.S. Const., amend. IV) and Illinois's search and seizure clause (Ill. Const. 1970, art. I, § 6)." *Id.* ¶ 3. Namely, that the "United States Constitution requires probable cause supported by 'oath or affirmation,' " while "the Illinois Constitution requires probable cause supported by 'affidavit.' " *Id.* (quoting U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6). Based on this distinction, the *Bass* majority found the Illinois Constitution gives greater protection than the fourth amendment of the United States Constitution and held that "arrests based solely on investigative alerts, even those supported by probable cause, are unconstitutional under the Illinois Constitution," which "requires, in the ordinary case, a warrant to issue before an arrest can be made." *Id.* ¶¶ 43, 62. The *Bass* majority also found that the traffic stop that resulted in the defendant's arrest had been unreasonably extended. *Id.* ¶ 73.

¶ 63    Justice Mason concurred in the reversal of the defendant's conviction in *Bass* because the

17

traffic stop had been unreasonably extended but dissented from the majority's holding with respect to investigative alerts. Justice Mason noted that, under the fourth amendment of the United States Constitution, "it does not matter how or when the police acquired the information giving rise to probable cause, as long as they possess it prior to the defendant's arrest." *Id.* ¶ 115 (Mason, J., concurring in part and dissenting in part). Justice Mason further observed that because "our supreme court has consistently interpreted the Illinois Constitution's search and seizure clause in conformity with the United States Supreme Court's interpretation of the fourth amendment," there was no reason to suspect that our supreme court would find this issue presented "one of those narrow exceptions to the 'limited lockstep' doctrine." *Id.* ¶ 116. Ultimately, Justice Mason concluded that the case was inappropriate for deciding the constitutionality of investigative alerts, but that she could "perceive no principled basis" to hold that police could arrest an individual without a warrant if they had probable cause but would "run afoul" of our constitution if "they issue[d] an investigative alert based on the same facts giving rise to probable cause." *Id.* ¶ 120.

¶ 64    Justice Coghlan was substituted onto the *Bass* panel after Justice Mason retired and wrote a dissent upon denial of rehearing. *Id.* ¶¶ 124-28 (Coghlan, J., dissenting upon denial of rehearing). Justice Coghlan adopted Justice Mason's partial dissent because it "recognize[d] both that historical case law validates arrests based on probable cause under the fourth amendment [citation] and reject[ed] application of the narrow exceptions to the limited lockstep doctrine to the facts of this case [citation]." *Id.* ¶ 126.

¶ 65    The Illinois Supreme Court granted the State's petition for leave to appeal in *Bass*. *People v. Bass*, 2019 IL App (1st) 160640, *appeal allowed*, No. 125434 (Ill. Mar. 25, 2020). In its decision, the court found that the motion to suppress in that case should have been granted based on the unreasonably extended length of the traffic stop. *People v. Bass*, 2021 IL 125434, ¶ 26. The court

explicitly stated that it expressed no opinion on "limited lockstep analysis, its application to warrants or investigatory alerts, or the constitutionality of investigative alerts," and vacated those portions of the appellate opinion. *Id.* ¶ 31. Thus, the appellate court's decision with respect to investigative alerts in *Bass* has been vacated.

¶ 66    More recently, the majority in *Smith* adopted the reasoning of *Bass* to find that the "defendant's warrantless arrest, based solely on an investigative alert, violated article I, section 6, of the Illinois Constitution." *Smith*, 2022 IL App (1st) 190691, ¶¶ 54-61, 99.

¶ 67    Other panels of this court, however, have disagreed with the reasoning in *Bass* and *Smith*. Shortly after *Bass* was issued, another panel of the First District found that it "was incorrectly decided." *People v. Braswell*, 2019 IL App (1st) 172810, ¶ 37. The *Braswell* court followed the reasoning in Justice Mason's dissent, concluding that "[t]he flaw in the majority's reasoning" was "that arrests must be based on probable cause, not warrants." *Id.* ¶ 39. Other decisions have since followed *Braswell* and declined to follow *Bass* or *Smith*. See *People v. Wimberly*, 2023 IL App (1st) 220809, ¶¶ 24-26; *People v. Simmons*, 2020 IL App (1st) 170650, ¶ 64; *People v. Thornton*, 2020 IL App (1st) 170753, ¶ 46; *People v. Bahena*, 2020 IL App (1st) 180197, ¶ 64.

¶ 68    The court in *Wimberly* also dismissed the language distinction between the Illinois and United States Constitutions, explaining that our supreme court in *People v. Caballes*, 221 Ill. 2d 282 (2006), interpreted the phrase " 'supported by affidavit' " in the Illinois Constitution of 1870—which is the same phrase used in article I, section 6, of the Illinois Constitution of 1970— as " 'virtually synonymous with "by Oath or affirmation" in the fourth amendment.' " *Wimberly*, 2023 IL App (1st) 220809, ¶ 23 (quoting U.S. Const., amend. IV). The *Wimberly* court concluded:

> "the perceived 'critical difference' between the fourth amendment to the United States
> Constitution and article I, section 6, of the Illinois Constitution that underlies the *Bass*

court's holding that arrests based solely on investigative alerts, even those supported by probable cause, are unconstitutional under the Illinois Constitution is nonexistent and cannot form the basis of an exception to the general rule that the search and seizure clause of our state constitution is construed in accordance with the United States Supreme Court's interpretation of the fourth amendment of the United States Constitution." *Id.*

¶ 69   In 2021, our supreme court granted a petition for leave to appeal from a case dealing with this issue, but ultimately dismissed the appeal because two justices "recused themselves, and the remaining members of the court [were] divided so that it [was] not possible to secure the constitutionally required concurrence of four judges for a decision." *People v. Dossie*, 2023 IL 127412, ¶ 1 (*per curiam*), *dismissing appeal from* 2021 IL App (1st) 201050-U. After dismissing *Dossie*, however, the supreme court granted leave to appeal in yet another case addressing this issue, *People v. Clark*, 2021 IL App (1st) 180523-U, *appeal allowed*, No. 127838 (Ill. Mar. 29, 2023). The opening brief in that case is presently due on November 17, 2023.

¶ 70   Until a decision is issued in *Clark*, we choose to follow the well-reasoned decision in *Braswell*, and those cases following it, and agree that, where probable cause exists, a warrantless public arrest based on an investigative alert or an instruction to arrest from the investigating officer is constitutional, so long as it is supported by probable cause. Accordingly, the trial court properly denied Mr. Streater's motion to quash his arrest and suppress the evidence.

¶ 71                                   C. Sentencing

¶ 72   Mr. Streater contends that he was denied a fair sentencing hearing because the trial court relied on an improper factor when sentencing him. Specifically, Mr. Streater argues that the trial court's comments during the hearing "indicated that [Mr.] Streater was penalized for holding the State to its burden of proof and for exercising his constitutional right to trial."

¶ 73     A trial court has broad discretion in sentencing a defendant. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). We will not set aside a sentence unless the court abused its discretion. *People v. Minter*, 2015 IL App (1st) 120958, ¶ 147. The trial court's consideration of an improper factor in aggravation constitutes such an abuse of discretion. *Id.* The presumption is that the trial court "considered all relevant factors in determining a sentence, and that presumption will not be overcome without explicit evidence from the record that the trial court did not consider mitigating factors or relied on improper aggravating factors." *People v. Boots*, 2022 IL App (2d) 200640, ¶ 43. "[T]he question of whether a court relied on an improper factor in imposing a sentence ultimately presents a question of law to be reviewed *de novo*." *People v. Abdelhadi*, 2012 IL App (2d) 111053, ¶ 8.

¶ 74     Mr. Streater claims that the trial court punished him for going to trial as evidenced by the court's statement in pronouncing the sentence that although Mr. Streater had "the right to claim [his] innocence," it was "disturbing" and "inappropriate" for him to suggest that K.W. was lying and that the kidnapping and sexual assault never happened to her. Mr. Streater argues that the comment by the court was particularly indicative of an improper sentencing consideration in light of Mr. Streater's remorseful allocution.

¶ 75     This comment does not suggest, as Mr. Streater argues, that he was being punished for maintaining his innocence. It was a direct response to statements made by Mr. Streater in the PSI report, in which he referred to K.W. as a liar and said that he hoped she would "one day admit that [he] did not do the crime." The court is not only permitted to consider that report—it is statutorily mandated to do so. 730 ILCS 5/5-3-1 (West 2020) ("A defendant shall not be sentenced for a felony before a written presentence report of investigation is presented to and considered by the court.); *id.* § 5-4-1(a)(2) (providing that at the sentencing hearing the court "shall" "consider any

presentence reports").

¶ 76    Moreover, the statement that the court found to be "inappropriate" was far more than an assertion of innocence. It was an accusation that K.W. had lied. The sentencing judge could view this accusation by Mr. Streater as reflecting an absence of remorse, and "a defendant's remorse or lack thereof is a proper subject for consideration at sentencing." *People v. Mulero*, 176 Ill. 2d 444, 462 (1997). Nothing in the judge's comment suggests that this sentence rested on an improper consideration.

¶ 77                              VI. CONCLUSION

¶ 78    For the foregoing reasons, we affirm Mr. Streater's convictions and sentence.

¶ 79    Affirmed.

*People v. Streater*, 2023 IL App (1st) 220640

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 17-CR-15760, the Hon. Ursula Walowski, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Tomas G. Gonzalez, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Tasha-Marie Kelly, and Julie Riekse, Assistant State's Attorneys, of counsel), for the People. |