2026 IL App (2d) 240641-U
No. 2-24-0641
Order filed March 3, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee,
v. ZANZIBAH T. STEWART, Defendant-Appellant.

Appeal from the Circuit Court of Kane County.
Honorable John A. Barsanti, Judge, Presiding.
No. 20-CF-2166

JUSTICE SCHOSTOK delivered the judgment of the court.
Justices McLaren and Mullen concurred in the judgment.

**ORDER**

¶ 1    *Held*: (1) In prosecution for aggravated criminal sexual assault, the State proved that defendant displayed a dangerous weapon (a knife) while committing the sexual assaults, even though the knife might not have been in the room at the precise time the assaults occurred. (2) Remand was not necessary because the trial court lacked jurisdiction to consider defendant's *pro se* allegations of ineffective assistance of counsel.

¶ 2    Following a jury trial in the circuit court of Kane County, defendant, Zanzibah T. Stewart, was convicted of three counts of aggravated criminal sexual assault (720 ILCS 5/11-1.30(a)(1) (West 2018)) and one count of aggravated unlawful restraint (*id.* § 10-3.1(a)). Defendant argues on appeal that the aggravated criminal sexual assault convictions should be reduced to criminal sexual assault because the State did not prove beyond a reasonable doubt the charged aggravating factor that enhanced criminal sexual assault to aggravated criminal sexual assault. Defendant also

argues that the case must be remanded for the trial court to inquire into allegations of ineffective assistance of counsel that appeared in a document defendant filed *pro se* in the trial court. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     The case proceeded to trial on three counts of aggravated criminal sexual assault, three counts of criminal sexual assault (*id.* § 11-1.20(a)(1)), and a single count of aggravated unlawful restraint.

¶ 5     At trial, T.S. testified that she had been romantically involved with defendant and that they had lived together for five to seven years. On November 8, 2020, the date of the charged offenses, defendant and T.S. lived in a house on Fairwood Drive in Elgin. Another woman, M.V., lived with them and had her own bedroom. According to T.S., the front door to the house led to the living room, but there was a "cutout" into the kitchen. A hallway led to the basement stairway, the garage, and the bedroom that T.S. and defendant shared. T.S. testified that on the date in question, she woke up and went to the living room. M.V. was not at home. Defendant was watching television in the living room. He and T.S. engaged in a casual conversation, but at some point, defendant stopped speaking and did not respond to T.S. Defendant then walked into the kitchen and started sharpening a knife. T.S. was sitting at the kitchen table. Defendant tossed the knife on the table and smoked marijuana. Defendant went back to the living room and started pacing. At some point, he leaned against the hallway wall and slid to the floor. Although T.S. was afraid, she went to comfort defendant. He told her not to touch him.

¶ 6     Defendant stood up and walked toward the part of the hallway near the kitchen. T.S. had her back against the wall, and defendant pressed his forehead forcefully against hers. He then walked back into the kitchen and said, " 'Zee is asleep, you're talking to his shadow.' " T.S.

explained that "Zee" was defendant's nickname. Defendant flicked T.S.'s glasses off of her nose with his finger and then flicked her nose. He told her that if she helped him "locate some targets and lure them in for him," no harm would come to her or her family. Defendant retrieved the knife and used it to "chop[ ]" a drinking cup, splitting it and causing its contents to splatter. While defendant was wielding the knife, T.S. "fe[lt] like [she was] going to get hurt." Defendant flicked T.S.'s robe open with the knife and told her to take it off. She complied. She had nothing on under the robe. Still holding the knife, defendant told T.S. to follow him down the stairs to the basement.

¶ 7 In the basement, defendant told T.S. to squat on a folding chair, facing its back, and defecate onto the floor. She tried but was unable. While holding the knife, defendant told T.S. to follow him upstairs. Once upstairs, defendant walked toward the bedroom but returned to the kitchen and said that T.S. was "going to be late," which she understood to mean that she was going to be late for work. T.S. was scheduled to work that afternoon.

¶ 8 Defendant then proceeded to the bedroom. T.S. followed him. She was "shaking and ***
afraid." Defendant asked her if she was afraid and if she thought he would hurt her. She nodded her head. Defendant replied, "[O]h, no." He added, "That's some human pussy s***. I'm much worse." Defendant put a towel on the floor and then had T.S. lie on it on her back. Defendant undressed. Totally nude, he pinned T.S. down and placed his "rear" on her face and defecated. He told her to lick his anus, which she did. Defendant then got up, put his penis in T.S.'s mouth, and urinated. Defendant and T.S. then went into the bathroom. Defendant took a shower, and T.S. started scrubbing her mouth with a toothbrush and also scrubbing her face. Defendant told her to get into the shower, and she complied. After washing off defendant's feces, she returned to the bedroom to get dressed for work. When she put her panties on, defendant grabbed her arm, bent her over the bed, and placed his penis in her vagina. Defendant then left. T.S. took another shower

and got dressed. She was afraid to go to the police, so she went to work. However, she left work early and met with M.V. Together, they went to the police station and later to a hospital, where a sexual assault examination was performed.

¶ 9 Defendant testified that on November 7, 2020, he and T.S. agreed to create a "scat" video, which he described as a video of sexual activity involving feces and urine. They planned to earn money by uploading the video to a pornographic website. Defendant awoke on November 8, 2020, between 2:30 a.m. and 2:45 a.m. T.S. was awake and using her phone beneath the blanket. Defendant went to the living room and watched the movie "Hook," which was about Peter Pan as an adult. In defendant's favorite scene from the movie, a character throws a coconut at Peter Pan, who grabs a knife or a sword and slices the coconut in half. Defendant tried to reenact the scene with a kitchen knife and some pieces of fruit. Later, he went to paint in his "meditation room."

¶ 10 T.S. woke up and emerged from the bedroom between 11 a.m. and noon. Defendant kissed her, and they started talking. Defendant asked T.S. why she was on the phone in the early morning hours. Defendant was concerned that she was cheating on him. T.S. became quiet, and defendant began to worry that his suspicions were correct. However, defendant tried to "brush it off." Defendant showed T.S. the knife trick he had been practicing earlier. He tossed an already-damaged cup into the air and "chopped" it with the knife "to try to imitate what [he had] seen in the movie." T.S. did not seem impressed and appeared to have something on her mind. Defendant testified that he did not threaten T.S. with the knife; he was just acting "goofy." When he finished reenacting the movie scene, he placed the knife on the kitchen counter and went into the living room.

- 4 -

¶ 11    T.S. followed defendant into the living room and showed him some texts on her phone. The texts reinforced his belief that T.S. was cheating on him. He lay down on the floor in the hallway. T.S. tried to place a pillow under defendant's head, but he told her not to touch him.

¶ 12    Eventually, defendant decided that he had been overreacting. He got up and sat at the kitchen table. T.S. joined him, and they conversed. He asked if she was still interested in creating a scat video. T.S. said that she was. Defendant was not holding the knife at this time. They went down to the basement, but defendant went back to the kitchen, retrieved the knife, and returned to the basement. He testified that the knife was going to be used as a prop in the video. He also got a T-shirt bearing a vulgar slogan about one of the candidates in the recent presidential election. He did not hold the knife up to T.S. and did not use it to flick open her robe. T.S. undressed, and defendant asked her to stand over the shirt and defecate on it while he recorded the video. When he noticed the tattoo on her foot, he stopped recording because he did not want any identifying features on the video. They tried to record the video again, but defendant stopped the recording when T.S. spoke. Defendant did not want her voice (which could have been used to identify her) on the recording.

¶ 13    After the second attempt, they abandoned the project and went upstairs. Defendant left the knife in the basement. Once upstairs, they started kissing, and defendant asked T.S. if she wanted to engage in "scat play." She agreed. They went into their bedroom, and T.S. lay down on a towel. Defendant undressed and straddled T.S., who began to "orally perform" on defendant's "anal area." With T.S.'s permission, defendant then defecated onto her face. After T.S. wiped her face, defendant placed his penis in her mouth. While T.S. performed oral sex on defendant, he urinated a little bit. He asked if T.S. was okay, and she indicated that she was. They then went into the bathroom and took a shower, during which defendant performed oral sex on T.S. After the shower,

defendant checked the time. It was 3:20 p.m. or 3:30 p.m., and T.S. was due at work at either 3 p.m. or 3:30 p.m. However, they decided to have intercourse before she left.

¶ 14    On January 24, 2024, the jury found defendant guilty of all charges. Defendant filed a timely posttrial motion, which was denied on June 5, 2024. At the June 11, 2024, sentencing hearing, the trial court merged the criminal sexual assault convictions into the aggravated criminal sexual assault convictions. The court then sentenced defendant to consecutive prison terms of 2 years for aggravated unlawful restraint and 16 years for each of the three counts of aggravated criminal sexual assault. Defendant filed a timely motion to reconsider sentence, which was denied on September 27, 2024.

¶ 15    The record contains a handwritten document from defendant setting forth various allegations of ineffective assistance of counsel. In the document, which was dated October 15, 2024, and filed by the circuit clerk on October 21, 2024, defendant stated, "I am taking the liberty in *Pro Se* to address the Kane County 16th Judicial Circuit Court; and all parties, agents & entities whom were involved *** in Case No. 2020CF2166, ***." On October 22, 2024, defendant's attorney filed a notice of appeal.

¶ 16                                    II. ANALYSIS

¶ 17    On appeal, defendant argues that (1) the evidence was insufficient to sustain his convictions of aggravated criminal sexual assault and (2) the case must be remanded for an inquiry into his *pro se* allegations of ineffective assistance of counsel. With respect to the second argument, we note that, in some circumstances, a decision favoring the defendant makes it unnecessary to address other issues raised on appeal; as pertinent here, a reviewing court that orders a remand might defer consideration of the other issues until completion of the proceedings on remand. See *e.g.*, *People v. Wilhelm*, 2025 IL App (5th) 240389-U, ¶ 56 (retaining jurisdiction of undecided

claims, which the defendant could raise in a subsequent appeal if dissatisfied with the proceedings on remand). However, when a defendant challenges the sufficiency of the evidence, it is appropriate to address that claim, rather than defer consideration. Otherwise, if the proceedings on remand lead to a new trial, the defendant would be exposed to a possible double jeopardy violation. *People v. Tellor*, 2025 IL App (5th) 230096-U, ¶¶ 43-44. To guard against that danger, we begin our analysis with consideration of the sufficiency of the evidence.

¶ 18    In reviewing a challenge to the sufficiency of the evidence in a criminal proceeding, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Collins*, 106 Ill. 2d 237, 261 (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Generally, "a reviewing court will not substitute its judgment for that of the trier of fact on issues involving the weight of evidence or the credibility of witnesses." *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224-25 (2009). The testimony of a single witness is sufficient to convict where the testimony is positive and credible, even when contradicted by the defendant. *People v. Adams*, 2023 IL App (2d) 220061, ¶ 97.

¶ 19    Defendant does not dispute that the evidence was sufficient to sustain verdicts of guilty of criminal sexual assault. A person commits criminal sexual assault, as charged here, when he or she commits an act of sexual penetration and uses force or the threat of force. 720 ILCS 5/11-1.20(a)(1) (West 2018). T.S. testified that defendant committed three acts of penetration—having her lick his anus, placing his penis in her mouth, and placing his penis in her vagina. A person who commits criminal sexual assault is guilty of aggravated criminal sexual assault if any of several aggravating factors "exist during the commission of the offense." *Id.* § 11-1.30(a). The aggravating factor charged here was that defendant "display[ed] *** a dangerous weapon, other

than a firearm[.]" *Id.* § 11-1.30(a)(1). Defendant does not dispute that the knife T.S. described was a dangerous weapon. However, defendant argues that the evidence does not establish that he displayed the knife "during the commission" of the three criminal sexual assaults. We disagree.

¶ 20   It has been observed that:

> "[T]he 'offense' of criminal sexual assault is not merely sexual penetration, full stop—it is sexual penetration plus the use or threat of force, a separate element of the offense. The precise act of sexual penetration occurs at a fixed moment (or moments) in time. ***.
>
> The use or threat of force, on the other hand, does not occur solely at the precise time of sexual penetration. To be sure, the use or threat of force may continue *during* the sexual penetration—it usually does—but that is not when the use or threat of force *begins*.
>
> The use of force occurs 'when the accused overcomes the victim by use of superior strength or size, physical restraint, or physical confinement' [Citation.] By definition, that force will *precede* the act of sexual penetration by at least some amount of time—seconds, minutes, whatever amount of time it takes to 'overcome' the victim.
>
> So, too, with the 'threat of force,' which occurs, in relevant part, 'when the accused threatens to use force or violence on the victim ***, and the victim under the circumstances reasonably believes that the accused has the ability to execute that threat.' [Citation.] It is so obvious that it hardly requires saying: A threat of force precedes the sexual penetration by some amount of time; it lingers over the victim, who is subdued precisely because the victim has a reasonable belief that the accused 'has the ability to execute that threat' of force. [Citation.]

The point being, the 'offense' of criminal sexual assault does not begin and end at the fixed point in time of the sexual penetration. It begins when the offender first uses force or the threat of force along the way toward ultimately accomplishing sexual penetration. So when the aggravated criminal sexual assault statute provides for the aggravation of the crime based on the 'display[ ], threat[ ] to use, or use[ ]' of a dangerous weapon 'during the commission of the offense,' the phrase 'during the commission of the offense' must include the period of time in which the offender used or threatened force. [Citation.] Any other reading would ignore one of the elements of criminal sexual assault and focus exclusively on the other, sexual penetration.

So we categorically reject [the] defendant's claim that he could not have been guilty of aggravated criminal sexual assault unless he displayed the knife at the precise moment of sexual penetration." (Emphases in original.) *People v. Smith*, 2019 IL App (1st) 161246, ¶¶ 28-33.

¶ 21 In light of these principles, it is clear that defendant's display of a dangerous weapon occurred "during the commission" of the criminal sexual assaults in the bedroom. Before the sexual assaults occurred, defendant took a knife, flicked open T.S.'s robe, and told her to take off the robe. He then told her to follow him down into the basement. There, while still holding the knife, he told her to defecate. Afterward, knife still in hand, he told her to follow him upstairs. At that point, if not earlier, defendant was clearly threatening the use of force, for purposes of the predicate offense of criminal sexual assault. To be sure, the testimony is unclear as to the knife's whereabouts during the sexual assaults. Defendant testified that he left the knife in the basement while he and T.S. went upstairs and engaged in consensual sexual activity. T.S. did not comment on the presence of the knife when she testified about the assaults. But even if defendant did not

bring the knife upstairs, the jury could reasonably conclude that the threat of force (which began no later than when defendant, while armed with a knife, told the victim to follow him upstairs) "lingered over" the victim as defendant engaged in three acts of sexual penetration with her on the main floor.

¶ 22    Defendant's attempt to distinguish *Smith* and a similar case, *People v. Streater*, 2023 IL App (1st) 220640, is unpersuasive.  In *Smith*, the defendant was found guilty of two counts of aggravated criminal sexual assault.  *Smith*, 2019 IL App (1st) 161246, ¶ 1.  The State presented evidence that the defendant entered the bedroom of his former girlfriend, S.N., while she was sleeping.  *Id.* ¶¶ 5, 9.  He had a knife in one hand and a roll of duct tape in the other.  *Id.* ¶ 9.  The defendant attempted to restrain S.N. with the duct tape and, in doing so, put the knife down.  *Id.* ¶ 10.  He was unable to tape her hands, but he held both of her wrists in one hand while he sexually assaulted her.  *Id.* ¶ 11.  He left the room but returned later with the knife and duct tape and sexually assaulted her a second time.  *Id.* ¶ 13.  The *Smith* court rejected the defendant's argument that, because he was not holding or displaying the knife at the precise moment of each sexual assault, the State failed to prove that he displayed a dangerous weapon during the commission of those offenses.  *Id.* ¶¶ 24, 33.

¶ 23    In *Streater*, the defendant, who was holding a baseball bat, dragged the victim into the front seat of his car and drove away.  *Streater*, 2023 IL App (1st) 220640, ¶ 13.  Before driving off, the defendant put the baseball bat in the back seat of the car.  *Id.*  He stopped the car in an alley, threw the victim into the back seat, climbed over after her, and sexually assaulted her there while the bat lay nearby; neither she nor the defendant attempted to grab it.  *Id.* ¶ 14.  Citing *Smith*, the *Streater* court rejected the defendant's argument that, because the victim did not testify that the defendant

touched the bat after forcing the victim into his car, the State failed to prove that he displayed a dangerous weapon during the commission of the sexual assault. *Id.* ¶¶ 50-51, 53.

¶ 24　Defendant argues that, unlike the defendants in *Smith* and *Streater*, he "did not display the knife concurrently with any use of or threat of force intended to accomplish the acts of sexual penetration." As discussed, that is untrue. Defendant also argues that, unlike the defendants in those cases, he abandoned the knife long before he engaged in any acts of sexual penetration. But while defendant testified that he left the knife in the basement, it is not clear that any significant amount of time elapsed from that point until he engaged in the acts of penetration. In any event, so long as the knife was displayed at some point during the commission of the offenses (as we have concluded it was), it makes no difference when he abandoned the knife. We find nothing to suggest that the evidence of the proximity of a weapon throughout the commission of the offenses in *Smith* and *Streater* was essential to their outcomes. Rather, in both cases, the court was clear that the initial display of the knife or bat was sufficient to satisfy the "dangerous weapon" aggravating factor. See *Smith*, 2019 IL App (1st) 161246, ¶ 36 (noting that the knife was nearby during the assaults, but also noting, alternatively, that "the requirement that the knife be displayed 'during the commission of the offense' does not require that it be displayed at *all* times during its commission." (Emphasis in original.)); *Streater*, 2023 IL App (1st) 220640, ¶ 54 ("In this circumstance, a rational trier of fact could also find that the presence of the bat in the back seat a short time after the bat was used to force her into the car *further* constituted a display of a dangerous weapon during the commission of the criminal sexual assault." (Emphasis added.))

¶ 25　We note that a single threat of force could be a common element of all three criminal sexual assaults. See *People v. Smith*, 2019 IL 123901, ¶¶ 17-19 (multiple convictions are permissible when a single physical act is a common element of multiple offenses that require proof of

additional acts).  Because all three offenses began with the threat of force that occurred no later than the point when defendant, while armed with a knife, told the victim to follow him upstairs from the basement, the evidence was sufficient to establish that defendant displayed the knife during the commission of all three offenses.  Accordingly, we conclude that the evidence was sufficient to sustain defendant's convictions of aggravated criminal sexual assault.

¶ 26    We next consider whether this case must be remanded for the trial court to inquire into the allegations of ineffective assistance of counsel outlined in the document that defendant filed *pro se* in the trial court.  In *People v. Krankel*, 102 Ill. 2d 181, 189 (1984), our supreme court held that a defendant who files a *pro se* claim of ineffective assistance of counsel is entitled to new counsel to represent him in connection with the claim.  The supreme court later modified the rule, holding that the trial court should conduct a preliminary inquiry and appoint new counsel if the *pro se* allegations show possible neglect of the case.  *People v. Jolly*, 2014 IL 117142, ¶ 29.

¶ 27    The State argues that "the trial court did not err by not conducting a *Krankel* hearing because it did not have jurisdiction to do so once the notice of appeal was filed.  Therefore, this case should not be remanded for a *Krankel* inquiry."  The State cites, *inter alia*, *People v. Darr*, 2018 IL App (3d) 150562, ¶ 87, where, like here, the defendant sought a remand for a *Krankel* hearing.  In *Darr*, the court stated that the defendant's *pro se* allegations of ineffective assistance of counsel and his notice of appeal were filed "contemporaneously."  *Id.* ¶ 93.  In fact, they were all part of the same document (*id.* ¶¶ 41, 93), so it is more accurate to say that they were filed simultaneously.  The *Darr* court held that because the notice of appeal divested the trial court of jurisdiction, any ruling it entered based on its *Krankel* inquiry would be void.  *Id.* ¶ 93.  Under those circumstances, the *Darr* court refused to remand the case for a *Krankel* inquiry.  *Id.* ¶ 99.  In

*People v. Inman*, 2023 IL App (4th) 220616-U, ¶¶ 29-32, an unpublished decision that the State cites as persuasive authority, the court followed *Darr* under essentially identical circumstances.

¶ 28     This case, however, presents slightly different circumstances from *Darr* and *Inman*. Defendant filed his *pro se* assertions of ineffective assistance of counsel *before* the notice of appeal, but *after* the trial court denied his motion to reconsider his sentence. Thus, because that motion was denied before he asserted his ineffective assistance claims and his claims were filed more than 30 days after judgment, the trial court no longer had jurisdiction to consider his claims.

¶ 29     In reaching this conclusion, we find instructive *People v. Orahim*, 2019 IL App (2d) 170257. In that case, the defendant timely filed a motion to reconsider his sentence, which the trial court denied. *Id.* ¶ 1. The defendant subsequently moved to withdraw his guilty plea. *Id.* The trial court denied the second motion a few months later and the defendant appealed. *Id.* We held that the trial court's jurisdiction lapsed after it ruled on the defendant's first motion, and therefore it did not have jurisdiction to consider the second motion. *Id.* ¶ 5. Crucial to this holding was the fact that the defendant filed his second motion more than 30 days after the judgment. *Id.* ¶ 7. Consequentially, we lacked jurisdiction to consider the appeal since the notice of appeal was not timely filed. *Id.* ¶ 12.

¶ 30     Here, defendant was sentenced on June 11, 2024. He filed his motion to reconsider on June 28, 2024, which was denied on September 27, 2024. Defendant then filed his *pro se* assertions of ineffective assistance on October 21, 2024, one day before the notice of appeal was filed through counsel on October 22, 2024. Although we have jurisdiction to consider the appeal because the notice of appeal was timely filed, the trial court did not have jurisdiction to consider the claims of ineffective assistance because defendant filed his claims after the trial court denied his motion to

reconsider and more than 30 days after judgment. Therefore, the trial court did not err in not holding a *Krankel* hearing and we need not remand for such a hearing.

¶ 31                                    III. CONCLUSION

¶ 32     For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 33     Affirmed.