2025 IL App (1st) 231196-U
Order filed: May 1, 2025

FIRST DISTRICT
FOURTH DIVISION

No. 1-23-1196

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 18 CR 10999 |
| | ) | |
| BRIAN HARRIS, | ) | Honorable |
| | ) | Joanne Rosado, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE ROCHFORD delivered the judgment of the court.
Justices Hoffman and Lyle concurred in the judgment.

**ORDER**

¶ 1    *Held*:   We affirmed on defendant's claims of error related to the admission of evidence, closing argument, and sentencing, but remanded for a preliminary *Krankel* hearing.

¶ 2    A jury convicted defendant, Brian Harris, of first-degree murder and he was sentenced to 55 years' imprisonment. On appeal, defendant argues that the trial court erred by (1) admitting a prior consistent statement made by one of the witnesses, (2) failing to conduct an adequate factual inquiry under *People v. Krankel*, 102 Ill. 2d 181 (1984), into his posttrial claim of ineffective assistance of counsel, and (3) imposing an excessive sentence predicated on improper sentencing considerations. Defendant also contends that the State deprived him of a fair trial by making

various improper comments during closing arguments. We remand so that the trial court may make a proper factual inquiry under *Krankel*. We affirm as to the other issues.

¶ 3     The State charged defendant with the shooting death of Jeremy Ross during the early morning hours of May 28, 2018. At the jury trial, Jonna Henderson testified that she and Jeremy were dating at the time of his death, and that Jeremy and defendant were friends. The night before Jeremy's death, Jonna was celebrating her birthday at her house with her sister, Ashley Davis, her friends Janae Datcher and Ciara Fuller, and with Jeremy and defendant. They were all drinking and talking and Jeremy also smoked marijuana. Jeremy and Jonna began to verbally argue. Eventually, Jonna, Jeremy, and defendant drove away from the party and pulled over next to a nearby elementary school, where Jonna and Jeremy continued to argue with each other. Defendant also began arguing with Jeremy. Jonna could not recall what they were all arguing about.

¶ 4     Jonna then began driving defendant and Jeremy back to her home. The argument between defendant and Jeremy "started getting bad," so Jonna pulled over next to a high school and they all exited the vehicle. Ciara drove up and Jonna walked over to her. Jeremy followed after Jonna, and she tried to calm him down. Jonna and Jeremy then returned to Jonna's automobile, where defendant was standing on the driver's side.

¶ 5     Jeremy and defendant resumed their argument; Jeremy was "in the defendant's face." Defendant pulled out a gun. Jeremy had a liquor bottle in his hand but was otherwise unarmed. Jeremy asked defendant whether he was going to shoot him. Defendant replied that he would shoot both Jeremy and Jonna. Defendant then fired a shot at Jeremy, who fell to the ground. Defendant stood over Jeremy and shot him again in the head and then ran away. Jonna applied pressure to Jeremy's wounds until the police and paramedics arrived.

¶ 6     On cross-examination, Jonna stated that Jeremy's argument with her prior to his death was verbal and did not turn physical. On redirect-examination, Jonna testified that defendant had put the gun under the back seat of her automobile when they first entered the vehicle, but she never actually saw defendant grab the gun from under the seat prior to shooting Jeremy.

¶ 7     Janae Datcher testified that on the evening of May 27, 2018, Jonna drove her, defendant, Jeremy, and Ashley to a liquor store because they wanted to celebrate Jonna's birthday. When Jonna accelerated the vehicle, Jeremy told her to "stop driving like that because we have a gun in the car." Janae then saw the gun in defendant's possession.

¶ 8     After buying the liquor, they drove to Jonna's house, where they hung out on the porch listening to music and drinking and talking. At one point, Janae saw the gun "sitting on the porch between [defendant and Jeremy]." She did not remember hearing any arguing.

¶ 9     After awhile, the party broke up. Janae and Ashley subsequently left together and ended up outside a middle school with the other partygoers. Eventually, Janae and Ashley drove away from the middle school. As they were driving, Jonna called. She was crying and upset and said she was now at a nearby high school. Janae and Ashley drove to the high school, where Janae heard three gunshots, "two right back after each other and then a pause and then another one." She heard a lot of screaming and crying but she did not see the shooting.

¶ 10    Ciara drove over to them and they followed her to Jeremy's location. Jeremy was lying on the ground, gasping for air. Jonna was applying pressure to his wounds. Defendant was not there. The next day, Janae went to the police station and viewed a photo array. She identified someone other than defendant.

¶ 11    Ciara testified she attended the birthday party at Jonna's house with defendant, Jeremy, Janae, and Ashley. Another friend, Risha Dunlap, also joined them. Eventually, the party ended

and they all drove away and pulled up next to a middle school and hung out for a short time. Ciara did not witness any arguments. Ciara left the middle school and drove away with Risha. Ciara then received a phone call from Janae, asking her to drive over and check on Jonna, who was now at a nearby high school.

¶ 12    Ciara drove to the high school and saw Jonna and Jeremy outside of Jonna's automobile. Jonna entered Ciara's vehicle and they began to drive away, but Jonna "hopped out" a few moments later and walked back toward Jeremy, who was now standing near defendant.  Ciara remained in her vehicle and viewed them through her rear-view mirror.

¶ 13    Ciara saw Jonna attempting to push defendant and Jeremy away from each other, as if she was trying to defuse an argument. Risha said, "He about to shoot him." Ciara saw that defendant was holding a gun. Jeremy was unarmed. Defendant fired a single shot at Jeremy, who fell to the ground. Defendant then pointed the gun at Jonna, before walking back toward Jeremy and firing another shot at him as he lay on the ground.

¶ 14    The parties stipulated that if called to testify, Detective Brendan McCormack would state that while investigating the shooting on May 28, 2018, he spoke to Ciara. Ciara told him that she did not see the initial interaction between defendant, Jeremy, and Jonna because she was looking at her phone at that time. She "began to pay attention when the offender reached with his right hand to the front of his pants and struggled to pull a handgun with an extended clip out of his pants."

¶ 15    Ashley testified that she attended her sister, Jonna's, birthday party with Janae, Ciara, defendant, Jeremy, and Risha. They all subsequently left the party and pulled next to a nearby middle school. At the middle school, Ashley saw Jonna and Jeremy standing by Jonna's vehicle. They were verbally arguing with each other but no physical altercation occurred.

¶ 16    Ashley asked Jonna and Jeremy what they were arguing about, but they did not respond to her. Ashley then approached defendant, who was sitting in the backseat of Jonna's vehicle with a gun on his lap. Ashley asked defendant, "What's going on?" Defendant, responded, "I'm going to kill this [racial expletive] and get your sister." Ashley told defendant to "be cool," and then she walked back to Jonna and Jeremy and talked to them. After determining that everyone had "cooled down," Ashley returned to her automobile with Janae and they drove away.

¶ 17    As she was driving, Ashley received a phone call from Jonna, who said she now was at a nearby high school. Ashley drove to the high school, where she heard the sound of gunshots. Ciara drove up and she led them to Jonna and Jeremy. Jeremy was on the ground and Jonna was tending to him. Defendant was not there.

¶ 18    The next day, May 29, Ashley went to the police station and met with detectives to view a photo array. Ashley picked out defendant's photograph. Ashley identified People's Exhibit No. 6 as the photo advisory form. Ashley testified:

> "Q. And is this People's Exhibit No. 6 now up on the screen?
>
> A. Yes.
>
> Q. And People's Exhibit No. 6 has quotations at the bottom portion there. Is that your handwriting or someone else's handwriting?
>
> A. That's someone else's handwriting.
>
> Q. Are these accurate quotes that you said?
>
> A. Yes.
>
> Q. Can you please tell the jury what is written there?
>
> A. 'I saw him with a gun. He said I'm going to kill this [racial expletive].'
>
> Q. Those are quotes that you gave to the detective; is that correct?

A. Yes.

Q. And that's a quote that the defendant gave you; is that right?'

A. Yes."

¶ 19    Paul Presnell, a forensic investigator, testified that he recovered three .40 caliber cartridge cases at the crime scene. He also discovered a liquor bottle on the ground next to Jeremy's right hand.

¶ 20    Dr. Stephanie Powers, the medical examiner who performed Jeremy's autopsy, testified that Jeremy had alcohol, cocaine, ecstasy, and marijuana in his system. He had three gunshot wounds. There were two entrance wounds on the left side of his chest and another on the right side of his neck.  The first entrance wound to the left side of the chest was a perforating wound, meaning that the bullet entered and exited Jeremy's body. The bullet proceeded "from front to back, left to right, and slightly downwards as it pass[ed] through the body." The second entrance wound to the left side of the chest was a penetrating wound, meaning that the bullet remained in Jeremy's body. The bullet's trajectory was from front to back, left to right, and downwards. The third wound to the neck was a perforated wound, with the bullet exiting the back of the neck. Dr. Powers concluded that Jeremy's cause of death was from multiple gunshot wounds and that the manner of death was homicide.

¶ 21    Detective Anthony Gillespie testified that defendant was arrested in Alabama and brought to the Chicago Police Department on July 12, 2018. The officers gave defendant his *Miranda* warnings and he agreed to speak with them. Defendant initially told the officers that he did not recall being at the scene of the shooting. Defendant subsequently stated that Jeremy was shot by one of Jonna's family members. Defendant further said that Jeremy pushed Jonna's head on the night of the shooting and that in the past, Jeremy "beat on" Jonna.

¶ 22    After the State rested, defendant testified that he had known Jeremy for about 14 years and that they were best friends. Jonna was Jeremy's girlfriend. On May 27, 2018, Jonna drove defendant and Jeremy to a liquor store. After exiting the store, Jonna began driving them to her home, where they would celebrate her birthday. Along the way, Jonna received a phone call from a man, which she put on speaker phone. Jeremy grew angry at the phone conversation, snatched the phone from her, and accused Jonna of "messing around with [the] guy that was on the phone." Jonna denied the accusation. Jeremy then pushed Jonna's face and continued to accuse her of cheating on him with the person on the phone.

¶ 23    They arrived at Jonna's house and defendant saw Jeremy take ecstasy and cocaine. Jeremy told defendant that he was still upset with Jonna. Defendant did not see any physical altercation between Jeremy and Jonna at the party.

¶ 24    The party broke up. Defendant and Jeremy entered Jonna's car and she began driving. Jeremy was in the passenger seat and defendant was in the back seat. Jeremy again pushed Jonna's face, called her a liar, and pointed his finger at her. Jonna began to cry. Defendant was scared for Jonna and he told Jeremy to leave her alone. Jeremy reached under his seat, pulled out a gun, and pointed it at Jonna. She asked him to put the gun down. Defendant also yelled at Jeremy to put away the gun.

¶ 25    Jeremy refused to put the gun down, so defendant reached over the front seat and they began "tussling over the gun." Defendant was ultimately successful in getting the gun from Jeremy, and then defendant placed the gun on the floor between the driver's side door and the seat. Jeremy reached over Jonna as she was driving and tried to retrieve the gun, but Jonna used her forearm to push him back. Jeremy slapped Jonna in the face and then she pulled over by a high school and told everyone to get out of her vehicle.

¶ 26    Jonna and Jeremy exited the automobile while defendant remained inside. Defendant saw Jeremy begin to choke Jonna, who was crying and trying to pry his hands off her neck. Defendant retrieved the gun, got out of the vehicle, and attempted to separate Jonna and Jeremy. Jeremy yelled at defendant and asked him whose side he was on, and then he pushed defendant with his forearm and he smashed a bottle on defendant's head, above his left eye. Fearing for his life, defendant shot Jeremy in self-defense and then ran away. Defendant denied standing over Jeremy and shooting him in the head after he had fallen.

¶ 27    The jury convicted defendant of first-degree murder and found that during the commission of the offense, defendant personally discharged a firearm causing Jeremy's death. At the sentencing hearing, defendant made an oral motion pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984) alleging that his counsel provided ineffective assistance. The court ultimately denied the motion without appointing new counsel and sentenced defendant to 55 years' imprisonment. Defendant appeals.

¶ 28    First, defendant argues that the trial court erred by admitting a prior consistent statement from Ashley which unfairly bolstered her trial testimony that she had seen defendant with a gun and heard him threaten to kill Jeremy. Specifically, consistent with her trial testimony, Ashley testified that on May 29 she identified defendant in a photo array and told the detective that on the night of the shooting she had seen defendant with a gun and he had threatened to shoot Jeremy, telling her that, "I'm going to kill this [racial expletive] and get your sister." Ashley identified the photo advisory form that the officer had shown her prior to viewing the photo array and testified that there was handwriting on the bottom of the form, which stated, "I saw him with a gun. He said I'm going to kill this [racial expletive]." Ashley testified that the handwriting was not hers, but

that it accurately reflected what she had told the officer. The photo advisory form was displayed to the jury during Ashley's testimony.

¶ 29     Defendant argues that the court erred both by admitting Ashley's testimony about her prior consistent statement on May 29 and by allowing the State to display the photo advisory form containing a handwritten recitation of her statement. Defendant contends that the admission of Ashley's prior consistent statement, with the accompanying display of the photo advisory form, was prejudicial to him as her statement discredited his self-defense claim by suggesting to the jury that defendant had an extraordinary degree of animosity toward Jeremy and had a premeditated plan to shoot him.

¶ 30     Defendant forfeited review by failing to object at trial to Ashley's testimony or to the display of the photo advisory form (*People v. Enoch*, 122 Ill. 2d 176, 186 (1988)) but seeks plain error review under Illinois Supreme Court Rule 615(a) (eff. Jan. 1, 1967). Under the plain error rule, we may consider a forfeited claim when a clear or obvious error occurred and: (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against defendant, regardless of the seriousness of the error; or (2) the error is so serious that it affected the fairness of defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). However, before applying the plain error doctrine, we must determine whether an error actually occurred. *People v. Cosby*, 231 Ill. 2d 262, 273 (2008). Absent error, there can be no plain error. *People v. Wooden*, 2014 IL App (1st) 130907, ¶ 10.

¶ 31     Defendant argues that error occurred here because a party generally is not allowed to bolster the credibility of its own witness on direct examination by introducing her prior consistent statements. *People v. Anderson*, 2018 IL App (1st) 150931, ¶ 37. The danger in the admission of

prior consistent statements is that the jury may attach disproportionate significance to them, as people tend to believe statements that are often repeated. *Id.* However, the rule against the admission of prior consistent statements does not apply to statements of identification. *Id.* Section 115-12 of the Code of Criminal Procedure provides that "A statement is not rendered inadmissible by the hearsay rule if (a) the declarant testifies at the trial or hearing, and (b) the declarant is subject to cross-examination concerning the statement, and (c) the statement is one of identification of a person made after perceiving him." 725 ILCS 5/115-12 (West 2022). The admission of evidence is reviewed for an abuse of discretion. *People v. Kraybill*, 2014 IL App (1st) 120232, ¶ 42.

¶ 32    In the present case, there is no dispute that the first two elements of section 115-12 are met: Ashley testified at defendant's trial and was subject to cross-examination concerning her statement to the police. The issue is whether Ashley's statement to police gave too much detail so as to fall outside of section 115-12. Defendant is effectively arguing that section 115-12 only allows for the admissibility of Ashley's statement that she identified defendant's photograph but does not allow for the admissibility of her statement that prior to the shooting, defendant was armed with a gun and threatened to shoot Jeremy.

¶ 33    Defendant's argument is unavailing. Our supreme court has rejected the argument that a statement of identification admissible under section 115-12 is limited only to the witness' actual identification of the defendant. *People v. Tisdel*, 201 Ill. 2d 210, 219 (2002). The supreme court has instead broadly defined "statements of identification" to encompass "the entire identification process" so as to ensure that the jury is "fully informed concerning the reliability of a witness' identification, as well as the suggestiveness or lack thereof in that identification." *Id.* Here, the entire identification process included Ashley being given the photo advisory form and shown a photo array, during which she both identified defendant and made the statement at issue regarding

defendant's possession of the gun and his threat to kill Jeremy. As Ashley's statement was made as part of the identification process, it was admissible under section 115-12.

¶ 34    Defendant argues, though, that even if Ashley could properly testify to her statement about his possession of the gun and his threat to kill Jeremy, the court erred by also allowing the State to display to the jury the photo advisory form containing the handwritten account memorializing her statement. Defendant contends that *Anderson* is dispositive. In *Anderson*, 2018 IL App (1st) 150931, a witness testified that he saw Corey Anderson carrying a gun in his waistband, but that another person snatched the weapon from him and fired at a Monte Carlo. *Id.* ¶ 8. Three days after the shooting, the witness went to the police station and identified Anderson in a photo array. *Id.* ¶ 9. Next to Anderson's photograph, the witness wrote, "This is the person I know as Lord. He told me his name was Lord. I saw a gun in his waistband. The other guy took the gun from Lord and shot at the Monte Carlo." *Id.* ¶ 9. The State displayed the photo array to the jury and asked the witness to reconfirm the handwritten statement identifying Anderson, which he did. *Id.* The State later displayed the photo array with the accompanying handwritten statement during closing argument. *Id.* ¶ 48. On appeal, we held that the witness's testimony about what he wrote on the photo array was admissible under section 115-12. *Id.* ¶ 47. However, we further held that the display of the photo array during closing argument, coupled with its display during the witness's direct examination, unnecessarily and improperly emphasized the witness's statement in the eyes of the jury beyond what was allowable under section 115-12 and constituted error. *Id.* ¶¶ 48-49. In so holding, we specifically noted the closeness of the evidence. *Id.* ¶ 49.

¶ 35    Unlike in *Anderson*,  the State here displayed and inquired about the photo advisory form only briefly during Ashley's direct testimony and did not display it again to the jury during closing argument. Also, unlike *Anderson*, the evidence here was not closely balanced where multiple

witnesses testified to seeing defendant unjustly shoot the victim. Thus, *Anderson* is factually inapposite and does not compel us to find that the court committed plain error by permitting the brief display and inquiry of the photo advisory form during Ashley's direct testimony. Rather, we find that the brief display and inquiry of the photo advisory form was allowable under section 115-12 and did not constitute error, much less plain error.

¶ 36    Defendant also contends in a single sentence in his brief that the trial court erred by sending a hard copy of the photo advisory form to the jury for its use during deliberations. Defendant again forfeited review by failing to object at trial (*Enoch*, 122 Ill. 2d at 186) and he makes no argument for plain error review. Even if we were to address the issue, we would find no reversible error. The decision of whether to allow jurors to take exhibits into the jury room is left to the sound discretion of the trial court. *People v. Hunley*, 313 Ill. App. 3d 16, 38 (2000). In reaching its decision, the trial court balances the exhibit's probative value against its prejudicial effect, and the decision to send the exhibit to the jury will not be disturbed absent an abuse of discretion. *People v. Blommaert*, 184 Ill. App. 3d 1065, 1076 (1989). As discussed, the photo advisory form here had probative value in establishing defendant's identity under section 115-12. We also note that the trial court here sent *all* the exhibits, including the photo advisory form, to the jury room for the jury to review without emphasizing any one exhibit over the others or in any way indicating to the jury that it was to give special consideration to the photo advisory form. On this record, we find no abuse of discretion in the court's decision to send the photo advisory form, along with all the other exhibits, to the jury for its review.

¶ 37    Next, defendant argues that the State made various improper remarks during closing argument, depriving him of a fair trial. Defendant forfeited review by failing to object to the

remarks (*Enoch*, 122 Ill. 2d at 186), but he asks us to review them for plain error. For the reasons that follow, we find no error, plain or otherwise.

¶ 38 Prosecutors are afforded wide latitude during closing arguments, and any improper remarks will not merit reversal unless they cause substantial prejudice to defendant. *People v. McAndrew*, 2024 IL App (1st) 230881, ¶ 58. During closing arguments, the prosecutor may comment on the evidence presented or any reasonable inferences drawn therefrom and respond to remarks by defense counsel that clearly invite response. *Id.* There is currently a split in the appellate court regarding whether allegations of prosecutorial misconduct during closing arguments should be reviewed *de novo* or for an abuse of discretion. *Id.* We need not resolve the dispute because under either standard, we would affirm.

¶ 39 First, defendant contends that the following remarks by the State misrepresented Ashley and Janae's testimony:

"[Defendant] is a liar. He lied to Detective Gillespie in 2018, and when he took that witness stand yesterday, he lied to each and every single one of you. There is nowhere for him to run this time. He has backed himself into a corner of his own stories. The defendant did not have an unreasonable belief that night. He never believed, even unreasonably, that self-defense was necessary. He simply ran out of stories to tell.

There were too many witnesses who put the gun in his hand. So yesterday he needed a reason to justify it, and that's what he got up there and tried to do.

Ladies and gentlemen, you know the truth. You heard it from up here. You heard it from Jonna. You heard it from Janae. You heard it from Ciara. You heard it from Ashley. The defendant shot and killed Jeremy Ross."

¶ 40    Defendant contends that the prosecutor's comments misinformed the jury that Ashley and Janae had actually seen the shooting, when in fact they only heard the shooting and never testified to witnessing defendant shoot Jeremy. Defendant's contention disregards the context of the prosecutor's argument. The prosecutor never stated that Ashley and Janae were eyewitnesses to the shooting, but rather that their testimony, in conjunction with Jonna and Ciara's testimony, proved defendant was the shooter. The prosecutor's comment was a fair recitation of the evidence, where Jonna and Ciara testified to seeing defendant shoot Jeremy, while Ashley testified to seeing defendant earlier in the evening in possession of a gun and making threats against Jeremy, and Janae also testified to earlier seeing defendant in possession of a gun. Taken together, Jonna and Ciarra's eyewitness testimony of the shooting, coupled with Ashley and Janae's testimony regarding defendant's earlier gun possession and threat against Jeremy, was more than sufficient to support the prosecutor's argument that the jury "heard it" from those four witnesses that defendant shot and killed Jeremy. We find no error.

¶ 41    Next, defendant contends that the prosecutor misstated the evidence when he said, "Jeremy didn't have a gun that day. Jeremy didn't have any weapons." In fact, defendant testified to seeing Jeremy with a gun, specifically, defendant stated that Jeremy pulled the gun on Jonna during their car ride. However, defendant's testimony was contradicted by Jonna. The State's argument that Jeremy was not in possession of the gun was a comment on his lack of credibility, that the jury should believe Jonna over defendant. We find no error, as the prosecutor is allowed to comment on the defendant's credibility during closing arguments. *People v. Williams*, 2015 IL App (1st) 122745, ¶ 12.

¶ 42    Defendant argues, though, that contrary to the State's remark that Jeremy was not in possession of a weapon on the day of the shooting, Janae testified to Jeremy's joint possession of

the gun with defendant. Defendant's argument is not supported by the record. Review of Janae's testimony shows that she testified to first seeing the gun in *defendant's* possession while in the automobile on the way to the liquor store; she never testified to seeing Jeremy in possession of the gun while riding in the automobile. Janea testified she next saw the gun on Jonna's porch "between" defendant and Jeremy; again, Janae never testified that the gun belonged to Jeremy or that he was in possession of it while it was simply laying on the porch. Defendant was the only witness who testified to seeing a gun in Jeremy's possession and, as discussed, the prosecutor could rightly comment on the incredibility of his testimony. Accordingly, the prosecutor did not err when commenting that Jeremy was not in possession of the gun on the day of the shooting.

¶ 43    Next, defendant contends that the following comments by the prosecutor during rebuttal argument misstated the evidence and amounted to an improper "guilt by association" contention:

> "The defendant wants you to believe that he knew Jeremy, that he knew Jeremy was a violent guy that day. That he knew what Jeremy was capable of. Why are you hanging out with this guy? I understand you are friends, and it's hard to break friendships and those sorts of things but evaluate the reasonableness of the defendant hanging out with a super violent guy that all of a sudden he could turn deadly so I got to carry guns. Nothing reasonable about that."

¶ 44    Defendant's contention of error is without merit. The prosecutor's rebuttal argument properly responded to defendant's closing argument, in which defendant stated that he knew Jeremy since they were 16 years old, knew him "very well," and that he acted reasonably when he shot Jeremy because he knew what Jeremy was "capable" of. Clearly, defendant was insinuating to the jury that given their long relationship, defendant knew that Jeremy was capable of violence, and that such knowledge affected his state of mind at the time of the shooting, rendering the

shooting reasonable. In rebuttal, the prosecutor argued that it was unreasonable to believe that defendant would hang out with Jeremy if defendant knew he was a "super violent guy that all of a sudden he could turn deadly." The prosecutor did not mischaracterize the evidence or urge the jury to convict him based on "guilt by association," but instead responded to defendant's closing argument that he had acted reasonably in shooting Jeremy based on his knowledge of Jeremy's propensity for violence. We find no error, as the State's rebuttal comments were invited by defense counsel's argument. See *People v. Starnes*, 374 Ill. App. 3d 132, 138 (2007).

¶ 45 Next, defendant contends that the prosecutor misstated the evidence by arguing that his theory of self-defense was disproved by the downward trajectory of the bullets, and that "[t]o believe the defendant's story, you have to ignore the science." Defendant claims that the medical examiner, Dr. Powers, never testified that the downward trajectory of the bullets negated his claim of self-defense. Defendant cites case law holding that the prosecutor errs by suggesting an expert witness reached a factual conclusion that she did not actually reach. See *People v. Mpulamasaka*, 2016 IL App (2d) 130703, ¶ 110.

¶ 46 We find no misstatement of the evidence. Jonna and Ciara each testified to seeing defendant shoot Jeremy as he lay on the ground. Dr. Powers testified to the downward trajectory of the bullets. The prosecutor argued the reasonable inference that the downward trajectory of the bullets supported Jonna and Ciara's testimony that defendant shot Jeremy as he lay on the ground and thus was not acting in self-defense. The prosecutor may properly comment on any reasonable inferences drawn from the evidence. *McAndrew*, 2024 IL App (1st) 230881, ¶ 58. Accordingly, the prosecutor committed no error here.

¶ 47 Defendant further contends that the prosecutor's statement to the jury that it should not "ignore the science" somehow constituted a statement that defendant bore the obligation of

introducing scientific evidence to corroborate his self-defense theory and thereby improperly shifted the burden of proof to him. We disagree. The prosecutor simply asked the jury to consider the scientific evidence that *was* presented and in no way argued that defendant was required to present any further such evidence or that he bore the burden to prove his innocence. Defendant's contention of error is without merit.

¶ 48 Next, defendant contends that the prosecutor made an improper reference to his physical appearance by arguing:

"The defendant took the stand yesterday, and you had an opportunity to look at him. I know you were all looking at him. Did you see any marks on his head where he was maybe bashed with a glass bottle, you can look at him right now, no."

¶ 49 The prosecutor's reference to defendant's appearance was based on defendant's testimony that Jeremy hit him in the head with a glass bottle, above his left eye. The prosecutor challenged defendant's credibility by commenting that his face did not show any injuries consistent with such an attack. It is well established that the State may discuss the witnesses and their credibility during closing argument. *People v. Green*, 2017 IL App (1st) 152513, ¶ 77. As the prosecutor's comment was based on defendant's testimony and the jury's observation of him at trial and constituted a permissible attack on defendant's credibility, we find no error. See also *People v. Jackson*, 391 Ill. App. 3d 11, 44 (2009) ("Commenting on a defendant's appearance during closing argument is implicitly recognized as falling within the bounds of legitimate argument.").

¶ 50 Next, defendant contends that the prosecutor improperly shifted the burden of proof to him by stating, "Did he tell you about how he had to go to the hospital as he was running away and ditching that gun? No. No. No. Didn't happen because the story is just not reasonable." By commenting on defendant's failure to seek medical care for his injury, the prosecutor was again

attacking the credibility of his testimony that Jeremy had smashed a glass bottle over his left eye. We find no error.

¶ 51 Defendant argues that the cumulative effect of the individual errors he has claimed with respect to the State's closing argument requires reversal. As discussed, we have rejected defendant's individual claims of error. "Where the alleged errors do not amount to reversible error on any individual issue, there generally is no cumulative error." *People v. Moore*, 358 Ill. App. 3d 683, 695 (2005). Therefore, we find no reversible error based on the State's closing argument.

¶ 52 Next, defendant contends that his trial counsel committed ineffective assistance by failing to properly preserve for appellate review the various issues related to the State's closing arguments and the court's alleged error in admitting Ashley's prior consistent statement. We have already determined that none of those issues have any merit and, as such, defendant's claim of ineffective assistance fails for lack of prejudice. See *People v. Boose*, 2025 IL App (4th) 231467, ¶ 49 (lack of prejudice is fatal to a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984)).

¶ 53 Next, defendant argues that the trial court relied on improper factors during sentencing. Defendant forfeited review by failing to object at the sentencing hearing (*People v. Johnson*, 2024 IL 130191, ¶ 40) but asks us to conduct plain-error review. For the reasons that follow, we find no error, let alone any plain error.

¶ 54 The trial court has broad discretion during sentencing, and its sentence will not be set aside absent an abuse of discretion. *People v. Streater*, 2023 IL App (1st) 220640, ¶ 73. The trial court's consideration of an improper factor in aggravation constitutes such an abuse of discretion. *Id.* The question of whether the trial court relied on an improper factor during sentencing is a question of law reviewed *de novo*. *Id.*

¶ 55 Defendant first contends that the court improperly considered his refusal to abandon his claim of innocence when it stated, "I don't know that there is much remorse for what actually was done because I have not really seen it. That's unfortunate." The trial court may not impose a more severe sentence simply because defendant refused to abandon his claim of innocence. *People v. Donlow*, 2020 IL App (4th) 170374, ¶ 84. However, the trial court may consider defendant's lack of remorse when imposing sentence, as lack of remorse has a bearing on his potential for rehabilitation. *Id.* In determining whether the trial court improperly considered defendant's refusal to abandon his claim of innocence, we focus on whether the court indicated or implied that defendant would have received a more lenient sentence if he had abandoned his innocence claim. *Id.* If the court does so indicate, then the sentence likely was improperly influenced by defendant's persistence of innocence. *Id.* However, if the court merely addressed defendant's lack of remorse as it bore upon his potential for rehabilitation, then the court's reference to a defendant's claim of innocence does not constitute reversible error. *Id.*

¶ 56 Here, our review of the trial court's comments during sentencing shows that it never made any references to defendant's claim of innocence. The court began by noting the senseless loss of life in this case when defendant shot the victim in the chest and then shot him again while he was on the ground. The court recounted how defendant was not actually threatened or in fear for his life at the time of the shooting, and that he could have simply left the scene before it escalated into murder. The court repeated that the murder was senseless and concluded by commenting on defendant's lack of remorse and sentencing him to 55 years' imprisonment.

¶ 57 On this record, we find absolutely no indication that the court improperly considered defendant's refusal to abandon his claim of innocence when sentencing him. As discussed, the

court's brief reference to defendant's lack of remorse was a proper consideration as relating to his rehabilitative potential and did not constitute error.

¶ 58    Defendant contends that the court did not cite any evidentiary support for its conclusion that he was not remorseful, and that its conclusion was in fact contrary to his statement in allocution, where he said, "I just want to give my condolences and apologies to the family. And this thing never meant to happen. I'm just sorry, so deeply sorry about what happened." A sentencing court may infer lack of remorse from any admissible statement made by defendant, the manner of commission of the offense, or any other competent evidence adduced at the trial or the sentencing hearing. *People v. Matute*, 2020 IL App (2d) 170786, ¶ 59. In discussing the trial evidence, the court recounted how defendant shot Jeremy in the chest and then stood over him while he was on the ground and continued to shoot. The court found that defendant did not act in self-defense, that the murder was "senseless," and that defendant subsequently fled the scene so as to run away from the "consequences" of his actions. Based on this evidence, the court reasonably could infer that defendant lacked remorse.

¶ 59    Next, defendant contends that his sentence was wrongfully predicated on the court's misapprehension of the substance of Dr. Powers' expert testimony. Specifically, defendant takes issue with the following comment by the court during the sentencing hearing:

> "You shot him in the chest. And then once you stood over him while he was on the ground and continued shooting. This testimony was confirmed by the medical examiner, who explained there were two gunshots to the chest and a third that showed a downward trajectory."

¶ 60    Defendant contends that contrary to the trial court's finding, Dr. Powers never confirmed that defendant stood over Jeremy while shooting at him on the ground; instead, Dr. Powers testified

that there were "a variety of positions" that defendant could have been in at the time of the shooting. We find no error. The trial court heard the testimony of two witnesses, Jonna and Ciara, who testified to seeing defendant stand over Jeremy and shoot him while on he was on the ground. Dr. Powers testified that she examined Jeremy and determined that each of the bullets that entered his chest followed a downward trajectory. The trial court reasonably could infer from Dr. Powers' testimony regarding the downward trajectory of the bullets that the medical evidence was consistent with Jonna and Ciara's testimony that defendant stood over Jeremy and shot at him while he was on the ground. Further, to the extent, if any, that the court misremembered or misunderstood Dr. Powers' testimony, the error was harmless given Jonna's and Ciara's testimony supporting the court's finding regarding the commission of the murder; defendant's sentence would have been the same even if the court had not referenced or considered Dr. Powers' testimony.

¶ 61    Next, defendant argues that his sentence was excessive. The trial court has broad discretionary powers when imposing a sentence and we give great deference to its sentencing decision. *People v. Cole*, 2016 IL App (1st) 141664, ¶ 55. That is because the trial court is in a better position than the reviewing court to consider defendant's credibility, demeanor, moral character, mentality, environment, and habits. *Id.* Where the sentence imposed by the trial court is within the permissible statutory range, it will not be disturbed unless there has been an abuse of discretion. *Id.* An abuse of discretion occurs where the sentence is greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense. *Id.*

¶ 62    No abuse of discretion occurred here. At the sentencing hearing, the State presented victim impact statements from Jeremy's mother, friend, and daughter. The State informed the court that defendant had a prior felony conviction in 2012 for residential burglary and argued that he had

never shown any remorse for his commission of the murder. Noting that the sentencing range was 45 years' imprisonment to life in prison, the State asked for a sentence "far greater than the minimum."

¶ 63    Defendant presented supportive letters from his mother, his aunt, and a third person and made a statement in allocution. Defendant stated he has a close relationship with his mother and has five children who rely on him. He works in the fast-food industry and is a "productive member of society." He argued that the murder was "an aberration for him."

¶ 64    The court read the presentence report, considered the evidence in aggravation and mitigation, and noted the senselessness of the killing, defendant's lack of remorse, and the devastating effects of defendant's actions on both his own children and on Jeremy's family. The court then imposed the 55-year sentence, which was within the statutory range and only 10 years over the minimum sentence. The sentence was not greatly at variance with the spirit and purpose of the law, nor was it manifestly disproportionate to the nature of the offense. Accordingly, we find no abuse of discretion. Because defendant failed to demonstrate any error at his sentencing hearing, there was no plain error.

¶ 65    Next, defendant argues that the trial court erred in failing to conduct an adequate preliminary inquiry into his claim of ineffective assistance of counsel, as required under *Krankel*, 102 Ill. 2d at 187-89. He requests that the cause be remanded for the purpose of conducting such an inquiry. Under *Krankel* and its progeny, a *pro se* defendant is not required to do any more than bring his posttrial claim of ineffective assistance of counsel to the trial court's attention, and thus he is not required to file a written motion but may raise the issue orally. *People v. Ayres*, 2017 IL 120071, ¶ 11. When a defendant presents a *pro se* posttrial claim alleging ineffective assistance of counsel, the trial court should conduct an adequate inquiry into the factual basis for the claim.

*People v. Washington*, 2015 IL App (1st) 131023, ¶ 11. In making this inquiry, "some interchange between the trial court and trial counsel regarding the facts and circumstances surrounding the allegedly ineffective representation is permissible and usually necessary in assessing what further action, if any, is warranted on a defendant's claim." *People v. Moore*, 207 Ill. 2d 68, 78 (2003). The court may also discuss the allegations with defendant and consider its knowledge of defense counsel's performance at trial and whether the defendant's allegations are insufficient on their face. *Id.* at 78-79.

¶ 66    If the trial court determines, after the preliminary inquiry, that defendant's claim of ineffective assistance lacks merit or pertains only to matters of trial strategy, then it need not appoint new counsel and may deny the *pro se* motion. *Id.* at 78. However, if the allegations show possible neglect of the case, the court should appoint new counsel to represent defendant at the hearing on his ineffective assistance claim. *Id.* The issue of whether the trial court properly conducted a preliminary *Krankel* inquiry presents a legal question that we review *de novo. People v. Jolly*, 2014 IL 117142, ¶ 28.

¶ 67    The record here shows that on the date of his sentencing hearing, defendant specifically told the trial court that he wished to file a "*Krankel* motion for ineffective assistance of counsel." Once defendant raised the posttrial claim of ineffective assistance of trial counsel, the court was required under *Krankel* to conduct an adequate preliminary inquiry into the factual basis of the claim. *Ayres*, 2017 IL 120071, ¶ 11. Instead, though, the trial court expressed a misunderstanding of *Krankel*, informing defendant that the claim of ineffective assistance of counsel could only be raised on appeal. The court's statement was in error.

¶ 68    The court briefly passed the case. After reconvening, defendant told the court that he had "something to say." Defendant then proceeded to inform the court of the basis of his claim of

ineffective assistance of counsel, specifically, that his counsel had falsely told him that there was a video showing him shooting Jeremy and therefore that self-defense was his best option at trial. Defendant subsequently learned during the examination of the police officers at trial that no such video existed. Defendant told the court that if counsel had not lied about the existence of the video, he would have pursued a defense other than self-defense (likely a defense that someone other than defendant was the actual shooter).

¶ 69    The court then made an inquiry of trial counsel. However, the trial court's inquiry reflects that the court misunderstood defendant's claim of ineffective assistance; defendant had claimed that his counsel was ineffective for falsely telling him that a video of the shooting existed, but the court inquired of defense counsel whether he had manipulated or altered a video and then given it to defendant. Defense counsel stated that he had not given defendant any manipulated video. Defendant interrupted and attempted to explain to the court that he was not accusing his counsel of manipulating a video, but rather that he was accusing counsel of making up a story about the existence of the video. Defense counsel responded that he had shown defendant "some evidence" but that none of the evidence was manipulated. The trial court asked counsel, "So you made no alterations to that evidence, that was exactly as you received it from the State?" Defense counsel responded affirmatively. The trial court asked defendant if he was ready to proceed to sentencing. Defendant responded, "No, ma'am. Your Honor, for the record I would like to say I want to fire him for ineffective assistance of counsel and I would like to file a *Krankel* motion." The court did not further question either defendant or defense counsel about his ineffective assistance claim but instead conducted the sentencing hearing and sentenced defendant to 55 years' imprisonment.

¶ 70    On this record, the trial court clearly did not conduct an adequate preliminary inquiry into the factual basis of defendant's claim of ineffective assistance of counsel as required by *Krankel*.

As discussed, the claim related to his counsel's alleged deceit in falsely telling defendant that a video existed showing him shooting Jeremy, which convinced him to assert a claim of self-defense and forego a defense that someone else was the shooter. The court initially wrongfully informed defendant that his claim was not properly before it and should instead be raised on appeal. When defendant persisted in articulating his claim, the court misunderstood it and asked counsel about a non-existent claim, specifically, whether counsel had manipulated a video. When counsel denied manipulating any video, the court denied defendant's motion and proceeded to sentencing without ever addressing defendant's actual claim of ineffective assistance. The State now posits that the trial court probably determined that defendant's claim amounted to a disagreement with his counsel's strategy of mounting a theory of self-defense and, as such, that the motion was properly denied without the appointment of counsel. See *Ayres*, 2017 IL 120071, ¶ 11 (holding that if the trial court finds that the claim pertains only to trial strategy, then it may deny the motion without the appointment of counsel). The inherent flaw in the State's argument is that the court never considered or inquired about defendant's *actual* claim of ineffective assistance and therefore we cannot presume that the court made any findings thereto.

¶ 71 The State further argues that any error was harmless and it cites in support *People v. Tolefree*, 2011 IL App (1st) 100689. Tolefree was convicted of driving on a suspended license and driving without insurance. *Id.* ¶ 1. He brought an oral posttrial claim of ineffective assistance based on his counsel's alleged deficiencies in cross-examining the officer who made the traffic stop. *Id.* ¶ 10. The court informed Tolefree that he was very well represented at trial and denied his motion. *Id.* On appeal, Tolefree argued that the trial court failed to adequately inquire into his claim of ineffective assistance of counsel. *Id.* We found that the error was harmless where "[t]he trial court presided and heard all of the testimony at trial and we cannot say that the trial court had an

inadequate basis in the trial record to determine defendant's claims." *Id.* ¶ 46. In contrast to *Tolefree*, defendant's claim of ineffective assistance here did not relate to his counsel's performance at trial but rather to his counsel's alleged conduct prior to trial outside of the court's presence. The fact that the court presided over defendant's trial does not, in and of itself, provide the court with any basis for determining whether defendant made a valid claim of ineffective assistance based on his counsel's alleged pretrial conduct and, as discussed, the court never even inquired of counsel about the specific pretrial conduct underlying defendant's ineffective assistance claim. Given the court's failure to conduct an adequate pretrial inquiry into the factual basis of defendant's claim of ineffective assistance of counsel, we remand the cause to the circuit court for a preliminary *Krankel* hearing.

¶ 72 We emphasize that we are not remanding for the court to appoint new counsel and conduct a full evidentiary hearing on the issue of trial counsel's alleged ineffectiveness. Rather, we are remanding for the limited purpose of allowing the trial court to conduct the preliminary inquiry into the factual basis of defendant's claim that his counsel was ineffective for misrepresenting to him that a video existed showing him shooting Jeremy, as well as any other claims of ineffective assistance that were not addressed below. If the court determines that the claim of ineffectiveness is without merit or pertains only to trial strategy, the court shall deny the motion and leave standing defendant's conviction and sentence. See *e.g.*, *Moore*, 207 Ill. 2d at 81. If the court determines there was possible neglect of the case, then it shall appoint new counsel and conduct a hearing on the ineffectiveness claim. If the court determines after such a hearing that defendant did not receive effective assistance of counsel, it shall order a new trial. See *People v. Bell*, 197 Ill. App. 3d 618, 618 (1990).

¶ 73 Affirmed in part and remanded with directions.